**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

MICHAEL A. WAGERS,

        Plaintiff,

v.                                Case No.: 3:09-cv-01531

MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,

        Defendant.

**MEMORANDUM OPINION**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 14 and 16).   Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 7 and 8).

The Court has fully considered the evidence and the arguments of counsel.  For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.**    **Procedural History**

Plaintiff, Michael A. Wagers (hereinafter "Claimant"), filed applications for DIB and SSI on April 20, 2006, alleging that he had been disabled since April 6, 2006 due to:

"breathing problems, circulation problems, numbness in arms and legs and especially in left hand, pain in my left hand, dizziness, blackouts, complications from mini-strokes, chronic back pain, vision problems, panic attacks, depression, stuttering problems, and Barrett's esophagus."   (Tr. at 11 and 187). The Social Security Administration (hereinafter "SSA") denied the claims initially and upon reconsideration. (Tr. at 11). Thereafter, Claimant requested an administrative hearing, which was conducted on July 21, 2008 by the Honorable Rosanne M. Dummer, Administrative Law Judge (hereinafter "ALJ").  (Tr. at 38-84).  At the conclusion of the hearing, the ALJ left the record open for the collection of additional medical records and the completion of a consultative examination.  A supplemental hearing was held by the ALJ on September 16, 2008 to obtain further testimony on the additional evidence.  (Tr. at 24-37).  By decision dated October 30, 2008, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act and, therefore, was not entitled to benefits. (Tr. at 11-23).   The ALJ's decision became the final decision of the Commissioner on October 23, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).  Claimant timely filed the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g).  (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 12, 13, 14 and 16). Consequently, the matter is ripe for resolution.

## II.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity

by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental

capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental

impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3).

In this particular case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31, 2011. (Tr. at 13, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since April 4, 2006. The ALJ explained that Claimant had continued to work on a part-time basis for his prior employer in exchange for a rent-free apartment and some spending money, but the ALJ did not consider this work to rise to the level of substantial gainful activity. (Tr. at 13, Finding No. 2). Turning to the second step of the evaluation, the ALJ determined that Claimant had severe impairments of chronic lumbar strain; allergic rhinitis; nicotine and alcohol dependence; panic disorder without agoraphobia; adjustment disorder with depressed mood; shortness of breath assessed as chronic obstructive pulmonary disease ("COPD"); and depression by history with psychotic features. (Tr. at 13-15, Finding No. 3). Nonetheless, under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (hereinafter the "Listings"). (Tr. at 15-17, Finding No. 4). The ALJ assessed Claimant's RFC as the following:

> [C]laimant has the residual functional capacity to perform the full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c). He retains the ability to lift up to a maximum of 100 pounds frequently and 20 pounds continuously (Exhibit 23F). He can stand for a total of three hours out of an eight-hour workday, two hours without interruption; walk for a total of two hours out of an eight-hour workday, one hour without interruption; or sit for a total of three hours out of an eight-hour workday, two hours without interruption. He can frequently climb, stoop, kneel, crouch or crawl. He is limited to only occasional exposure to humidity,

wetness, extreme temperatures, and dust/odors/fumes/pulmonary irritants.  He can work in areas that have frequent exposure to loud noises, such as heavy traffic.

(Tr. at 17-21, Finding No. 5).

As a result, the ALJ found that Claimant could return to his past relevant work as a route supervisor, as it is generally and actually performed, and as an inside sales manager, both occupations being defined as medium level, semi-skilled work.  (Tr. at 21, Finding No. 6). The ALJ considered that (1) Claimant was 55 years old at the time of the administrative hearing; (2) he had a college education and could communicate in English; and (3) the transferability of his job skills was irrelevant as the Medical-Vocational Rules supported a finding of "not disabled" regardless of transferability of job skills. (Tr. at 21-22, Finding Nos. 7, 8, and 9). Using the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids") as a framework, and relying upon the testimony of a vocational expert, the ALJ concluded that jobs existed in significant numbers in the national and regional economy that Claimant could perform in view of his age, education, work experience and RFC and despite his limitations. (Tr. at 22-23, Finding No. 10).  As such, Claimant was not under a disability as defined by the Social Security Act.  (Tr. at 23, Finding No. 11).

## III.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence.  In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a

refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001). If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock v. Richardson, supra* at 775.

A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

## IV.   **Claimant's Background**

Claimant was fifty-five years old at the time of his administrative hearing. (Tr. at 167). He received a bachelor of art's degree in English and completed a typing class for which he received a certification thereafter. (Tr. at 43). Claimant's prior work experience included being a route supervisor for a vending/gaming machine company and performing inside sales functions for a music distribution company. (Tr. at 45).

## V.   **Claimant's Challenges to the Commissioner's Decision**

Claimant raises three specific challenges to the decision of the Commissioner, including the following:

1.      The ALJ erroneously assessed Claimant's credibility;

2.      The ALJ failed to properly consider the combined impact of Claimant's impairments; and

3.      The ALJ erred in rejecting the opinion of the Claimant's treating physician.

(Pl. Br. at 11-15).

In response, the Commissioner argues that the ALJ's credibility finding is substantiated by both the medical evidence and the evidence detailing Claimant's daily activities.   (Tr. at 16-18).   In addition, the ALJ fully evaluated Claimant's impairments, separately and in combination, as is evidenced by the written decision.   (Tr. at 18-19). Finally, the Commissioner contends that the ALJ properly rejected the opinions of Dr. Bailey and Dr. Ricard, because they were inconsistent with the overwhelming weight of the evidence.   (Tr. at 13-16).

## VI.   Relevant Medical Evidence

The Court has reviewed all evidence of record, including the medical evidence of record. The record includes medical documentation that pre-dates Claimant's alleged disability onset date of April 4, 2006. The Court considered this evidence to the extent that it elucidated Claimant's medical background.

### Pre-Onset Records

Claimant supplied medical records beginning in October 1997 from University Women's and Family Care,[1] his primary care physicians. The records created from that time through 2005 indicate that Claimant had multiple chronic health conditions,

---

[1] Apparently, this medical practice has had different names over the years, including University Women's and Family Care; Tri-State Medical Center; University Family Practice; Cabell Huntington Hospital Women's & Family Medical Center; and CHH Family Medical Center.   It has several locations, as well.

including gastroesophageal reflux disease ("GERD"); hypertension, low back pain; chronic obstructive pulmonary disease ("COPD"); anxiety and depression; transient ischemic attacks ("TIA"); hypothyroidism; and Barrett's esophagus.[2]  (Tr. at 358- 420). He also had a history of two prior surgeries for a detached retina (Tr. at 358) and feelings of claustrophobia when driving under an overpass.  (Tr. at 372).

On June 1, 2005, Claimant was admitted to St. Mary's Medical Center with complaints of vomiting bright red blood.  He advised the admitting physician that he had a history of Barrett's esophagus, which had caused him to suffer an upper gastrointestinal bleed in the past.  (Tr. at 253).  Claimant listed his medications as Lortab, Paxil, Monopril, Xanax and Zyrtec. (*Id.*).  Dr. Matthew Rohrbach performed an endoscopy on Claimant and diagnosed a Mallory-Weiss tear and a hiatal hernia.[3] Claimant was treated with Prevacid and Prilosec.  On discharge, he was instructed to follow-up with his family physician. (Tr. at 259-260).

In October 2005, Claimant had an episode of breathing difficulties that prompted him to go to University Women's & Family Care.  He was given a nebulizer treatment and told to quit smoking.  (Tr. at 262).  Claimant returned to the office in December 2005 for a tooth extraction.  He complained that he was stressed "due to finances," but none of the medications prescribed for his anxiety helped to relieve his symptoms. He declined additional medications or counseling at that time.   (Tr. at 264).

---

[2] Barrett's esophagus is a disorder in which the lining of the esophagus is damaged by stomach acid and is frequently associated with GERD.  Barrett's esophagus, itself, does not cause symptoms.  *PubMed Health*, National Center for Biotechnology Information (NCBI), National Library of Medicine (NLM), National Institutes of Health (NIH), 2009.

[3] A Mallory-Weiss tear is a tear of the mucous membrane of the lower esophagus or upper stomach usually caused by chronic coughing or vomiting.

**Post-Onset Records**

On April 28, 2006, Claimant presented to Dr. Shelley Bailey at University Women's and Family Care.  (Tr. at 263).  He told Dr. Bailey that he was applying for disability due to his breathing problems.  He also indicated that he was laid off from his job servicing electronic poker machines.  He lacked medical insurance, so Claimant declined pulmonary function studies.  (*Id.*).

On June 16, 2006, Claimant presented to St. Mary's Medical Center complaining of acute abdominal pain and chills.  (Tr. at 268-277).  His gallbladder was dilated, but otherwise, his imaging and laboratory findings were uninformative.  He was discharged after receiving fluids, but returned to the hospital two days later with the same complaints.   (Tr. at 278-279).   He was given pain medications, discharged, and instructed to follow-up with Dr. Harrison, a gastroenterologist.  (*Id.*).

On June 21, 2006, Claimant presented to Dr. Bailey still complaining of right upper quadrant pain.  (Tr. at 398).  Dr. Bailey referred Claimant to Dr. Harrison for possible gallstones.  In July, Claimant called Dr. Bailey and reported that he had gotten a "medical card" and thought it might help him find a surgeon willing to remove his gallbladder.  (Tr. at 400).[4]

Claimant returned to Dr. Bailey's office on October 12, 2006, complaining of a "stiff neck."  (Tr. at 403).  According to Claimant, he had experienced stiff necks in the past, but they generally did not last as long.  He reported that the issue started "after a long car trip."  (*Id.*).  Dr. Bailey diagnosed a cervical strain and prescribed Flexeril and Lortab.  By January 19, 2007, Claimant had "no more problems with neck pain."  (Tr. at

---

[4] Subsequent records document that Claimant underwent a surgical removal of his gallbladder.  *See* (Tr. at 425).

404).  He added that not working "helps out."  (*Id.*).

At a follow-up visit with Dr. Bailey in March 2007, Claimant advised that he was "stressed out due to high water."  (Tr. at 406).  He mentioned that he had experienced problems with his memory for ten years and appeared to be depressed.  Dr. Bailey performed a mini-mental state examination on Claimant, who received a score of 26 out of 30, indicating that any cognitive impairment suffered by Claimant was mild. (Tr. at 410).  Claimant stated that he was working some with his former boss and asked for a urological referral for an unrelated concern.  (*Id.*).  Dr. Bailey recommended Dr. Frank Richter, who evaluated Claimant on April 9, 2007.  (Tr. at 407-408).

On April 20, 2007, Claimant returned to Dr. Bailey's office for a check-up.  He told Dr. Bailey that he had fallen going up steps and had injured his back.  (Tr. at 409). He also gave a history of "stuttering."  Dr. Bailey assessed Claimant with hypertension, allergies and back pain.  She prescribed lisinopril and ordered routine laboratory studies.  She told Claimant to return in four months.  (*Id.*).

Instead, Claimant returned on June 13, 2007, complaining of "having problems breathing on humid days and other days" for the past 1-2 months.  (Tr. at 413).  Dr. Bailey prescribed Spiriva, Nasonex, and Singular and instructed Claimant to return in August or as needed.  (*Id.*).  Claimant returned in August, as instructed, reporting an increase in his breathing difficulties.  (Tr. at 412).

On January 23, 2008, Claimant returned to Dr. Bailey's office for symptoms related to his left hand.  He told Dr. Bailey that his hand was throbbing and he could not move it well.  (Tr. at 411).  Claimant advised Dr. Bailey that he had experienced symptoms of "mini strokes" approximately one month earlier that resulted in his blacking out and not waking up until the following afternoon.  (*Id.*).  He indicated that

he "wasn't talking well," but that his symptoms resolved after a few days.  Dr. Bailey ordered a CT scan of his head and told Claimant to return to the office in four months. (*Id.*).  The scan was scheduled to take place on February 27, 2008 at Cabell Huntington Hospital.  (Tr. at 416).[5]

At his next visit with Dr. Bailey on June 16, 2008, Claimant complained that he "felt like everything was closing in/couldn't get breath."  (Tr. at 417).  He also complained of a cough, so Dr. Bailey ordered a chest x-ray.  (Tr. at 418).  The x-ray revealed a nodular density in Claimant's left lateral lung.  (*Id.*).  The radiologist recommended a CT scan of the chest, which Dr. Bailey requested.  (Tr. at 420). However, if the scan was completed, no report of the results was submitted by Claimant.

### **Disability Assessments and Evaluations**

Lisa Tate, a Master's level psychologist, performed a psychological evaluation on Claimant on June 26, 2006.  (Tr. at 283-287).  Ms. Tate noted that Claimant had good personal hygiene and grooming; a normal gait and posture; no apparent vision problems, although he wore thick glasses; no hearing problems; and good overall speech.  (Tr. at 283).  Claimant described a 10-15 year history of panic attacks, which occurred less than one time per month and lasted approximately 30 minutes.  (Tr. at 284).  He also described being depressed since he was laid off earlier in the year, but denied receiving any mental health treatment.  (Tr. at 284).  Ms. Tate diagnosed Claimant with Panic Disorder without Agoraphobia based upon his long-standing history of panic attacks and Adjustment Disorder with depressed mood.  Overall, Ms. Tate felt Claimant's social functioning, concentration, persistence and pace were all

---

[5] The medical imaging report was not contained in the medical evidence of record.  Likewise, Dr. Bailey did not comment on the results at her next visit with Claimant. (Tr. at 417).

within normal limits.  (Tr. at 286-287).   Based upon this evaluation, Dr. G. David Allen completed a Psychiatric Review Technique on July 6, 2006, finding that Claimant did not have a severe psychiatric impairment.  (Tr. at 289-302).   This evaluation was later endorsed by Dr. Holly Cloonan on a reevaluation performed on December 5, 2006.  (Tr. at 321-333).   Dr. Cloonan opined that Claimant's reports of his psychiatric symptoms were credible to the extent that he had a documented history of anxiety and affective disorder; however, Dr. Cloonan did not believe Claimant's conditions were severe.  (*Id.*).

On July 18, 2006, Claimant was physically evaluated by Dr. Stephen Nutter of Tri-State Occupational Medicine.   (Tr. at 303-309).   Claimant reported his primary problem being shortness of breath.  He indicated that he had experienced this problem for approximately two years, and it became worse during hot and humid weather.  (Tr. at 303).   Claimant also complained of chronic back pain that was constant and was aggravated by bending, sitting, standing, lifting, vibration, coughing and sneezing.  (Tr. at 304).  Finally, Claimant stated that he started to experience intermittent numbness in his arms and legs approximately one year earlier and in the prior two to three months began having the same problem in his toes and fingers. (*Id.*). Although he had informed his physician of these problems, no tests or work-up had been ordered.

On examination, Dr. Nutter documented that Claimant had a normal gait and walked without the use of any handheld device.  He appeared comfortable in sitting and supine positions.  (*Id.*).  Claimant's lungs were clear to auscultation with no rubs, rales, or rhonchi noted.  (Tr. at 305).  His respirations were even and unlabored and his chest was clear to percussion.  (*Id.*).  Dr. Nutter found Claimant's grip strength to be equal and 5/5 bilaterally; his hands were without atrophy, swelling, redness, warmth, nodules or tenderness; he was able to pick up coins and write without difficulty.  (*Id.*).  Claimant

experienced some back pain on range of motion examination, but straight leg raising was normal and he showed no signs of radiculopathy.  (*Id.*).   He was able to walk on his toes and heels and squat, but had difficulty performing tandem gait due to poor balance. In summary, Dr. Nutter did not find evidence of a breathing problem.  He did note that Claimant complained of chronic back pain and had some range of motion limitations; however, he displayed no evidence of nerve root compression, sensory abnormalities, or muscle wasting.  (Tr. at 306).

As part of his evaluation, Dr. Nutter performed pulmonary function studies on Claimant.  (Tr. at 308-309).  The studies revealed that Claimant had no evidence of bronchospasm or acute respiratory illness.  His test results were within the normal range with a FEV1 at 3.12 or 90% of the predicted value.[6]  (*Id.*).

Cindy Osborne, D.O. completed a Physical Residual Functional Capacity Assessment on August 1, 2006.  (Tr. at 311-318).  Dr. Osborne determined that Claimant could occasionally lift and/or carry 50 pounds; could frequently lift and/or carry 25 pounds; could stand and/or walk about 6 hours in an eight-hour workday; could sit about 6 hours in an eight-hour workday; and had unlimited capability to push and pull. (*Id.*).   She found that Claimant had no postural, manipulative, visual, communicative or environmental limitations.   (*Id.*).    Dr. Osborne concluded that Claimant was only partially credible, noting that his pulmonary function studies did not support his claims of breathing difficulties and his physical examination contained only minimal abnormalities.   (*Id.*).

---

[6] FEV1 is a measurement of the reported one-second forced expiratory volume.

Dr. Osborne's opinions were bolstered five months later, on December 8, 2006, by Dr. Caroline Williams, who completed a second Physical Residual Functional Capacity Assessment.   (Tr. at 335-342).   Dr. Williams reached nearly identical conclusions to those of Dr. Osborne, except Dr. Williams found Claimant somewhat limited in balancing and stooping and felt that Claimant should avoid moderate exposure to unprotected heights.  (*Id.*).  She indicated that the medical evidence did not support the extent of functional limitation claimed by Claimant.  Likewise, Dr. Williams found no supporting medical evidence of "mini strokes," Barrett's esophagus, or circulatory problems.  (*Id.*).

In June 2006 and again on May 29, 2007, Claimant's treating physician, Dr. Shelley Bailey, completed a Physician's Summary for the West Virginia Department of Health and Human Resources ("DHHR").  (Tr. at 347-348).  In both documents, Dr. Bailey indicated that Claimant had an employment limitation in that he could not stay in the same position for an extended length of time and could not carry more than 5 pounds.  (*Id.*).

In September 2007, Dr. Jose Ricard completed a Medical Review Team evaluation also at the request of the DHHR.   (Tr. at 349-351).  Dr. Ricard diagnosed Claimant with hemiparesis due to cerebral vascular accident, COPD, esophagitis and GERD.  He opined that Claimant was unable to work due to his hemiparesis and that this disability would last at least one year.  (*Id.*).

On August 8, 2008, Dr. Drew Apgar performed a disability examination and assessment and then completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical) Form.  (Tr. at 422-447).  Dr. Apgar reviewed Claimant's medical history and medications prior to performing the examination.  On examination,

Dr. Apgar noted that Claimant had no difficulty getting onto or off the examining table; he had good posture and could move about the room without difficulty. Claimant's lungs were clear, although lungs sounds were coarse and air movement was poor. (*Id.*). He commented that while Claimant's chronic lung disease was apparent, Claimant's oxygen saturation level was 94% on room air and he had no evidence of wheezes, rales, or rhonchi. (*Id.*). When performing the musculoskeletal assessment, Dr. Apgar could not appreciate any muscle wasting, joint abnormality, swelling or instability. Dr. Apgar concluded as follows:

> Based on objective findings, claimant would have no difficulty with standing, walking, sitting, lifting, carrying, pushing, pulling, handling objects with the dominant hand, hearing, speaking, traveling. If there is a limiting factor it would be compromised pulmonary function which was not apparent in the limited exercise challenge of testing today.

(Tr. at 434). Dr. Apgar continued by opining that Claimant's mental status was essentially normal with no apparent limitations of concentration, persistence, pace, memory, understanding, interaction or adaptation. (*Id.*).

In the Ability To Do Work-Related Activities Assessment, Dr. Apgar opined that Claimant could frequently lift and carry up to 100 pounds and could continuously lift and carry up to 20 pounds. (Tr. at 440). He felt that Claimant was able to sit and stand up to three hours, each, in an eight-hour workday and could sit and stand uninterrupted for two hours, each. (Tr. at 441). Claimant was able to walk up to two hours in an eight-hour workday without the need of a cane. He had unlimited ability to reach, handle, finger, feel, push, pull and operate foot controls. (Tr. at 442). Claimant could frequently climb stairs, ramps, ladders, and scaffolds; could frequently stoop, kneel, crouch and crawl; and was unlimited in his ability to balance. Dr. Apgar found some environmental limitations in Claimant's ability to tolerate exposure to humidity, wetness, dust, odor,

fumes, pulmonary irritants, and extreme heat.  (Tr. at 444).

**VII.    A**n**alysis**

      After thoroughly scrutinizing the Transcript of Proceedings and the arguments of counsel as set forth in their memoranda, the Court finds that the Commissioner's decision is supported by substantial evidence and should be affirmed.   Each of Claimant's challenges will be addressed in turn.

      **A.    The ALJ's Credibility Assessment**

      Claimant insists that the ALJ had no basis for concluding that Claimant's assertions of disability were not fully credible. (Pl.'s Br. at 12).   According to Claimant, his file contains "an abundance of objective medical documentation" supporting the existence of chronic shortness of breath and other conditions which result in his inability to work.  (*Id.*).   The Commissioner counters by pointing out that the ALJ's finding was substantiated by numerous instances in which the Claimant's statements did not correspond with the other evidence of record; perhaps, most compelling of which was evidence that Claimant continued to work at his prior job on a part-time basis while simultaneously complaining that he was unable to perform his past job duties. (Def. Br. at 16-17).

      Social Security Ruling 96-7p clarifies the two-step process by which the ALJ must evaluate symptoms under 20 C.F.R. §§ 404.1529 and 416.929 to determine their limiting effect on a claimant.   First, the ALJ must establish whether the claimant's medically determinable physical and psychological conditions could reasonably be expected to produce the symptoms described by claimant.  SSR 96-7P.  Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, then the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine

the extent to which they prevent the claimant from performing basic work activities. *Id.* Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must make a finding on the credibility of any statements used to support the disabling effect of the symptoms. The Ruling sets forth the factors that the ALJ must consider in assessing credibility and instructs the ALJ that any credibility determination must be based upon a consideration of all of the evidence in the case record. *Id.*

In this case, the ALJ accepted that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms; thus, the ALJ evaluated the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they prevented him from working. The ALJ found that Claimant's statements concerning the intensity, persistence, and severity of his symptoms were not entirely credible, because they were inconsistent with other evidence in the record, including descriptions of Claimant's daily activities; the documented location, duration, frequency, and intensity of Claimant's symptoms; the lack of medical treatment; and the absence of supporting documentation. (Tr. at 19-21). The ALJ referred to specific pieces of evidence contained in the record that caused her to question Claimant's credibility. (*Id*).  For instance, the ALJ observed that Claimant had complained of "hand problems" and a "lack of strength" in his hands, but when tested, he was able to make a fist bilaterally; his hands were not atrophied; there was no evidence of swelling, warmth, tenderness, nodules, or redness; and his grip strength was 5/5 bilaterally. (*Id*). Similarly, Claimant alleged that his breathing difficulties were severe, yet his pulmonary function studies were all normal and he required only inhalers for treatment.  Moreover, Claimant continued to smoke; an activity that would not be

easily tolerated by someone with disabling shortness of breath.  (*Id*). Claimant further testified that he had serious panic attacks and memory problems; however, he also indicated that he could "talk himself through the attacks" and could watch television most of the day without forgetting the story lines. Claimant also alleged significant musculoskeletal impairments, yet never underwent physical therapy; did not use a TENS unit; did not require a cane; walked with a normal gait; was able to perform his grooming and household chores; could drive a car without difficulty and took long road trips.  Finally, Claimant contended that he was severely depressed and anxious, but admitted to visiting his friends frequently and working a couple of days each week.  (*Id*).

When evaluating whether an ALJ's credibility determinations are supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence . . . or substitute its own judgment for that of the Commissioner."  See *Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990).  Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."  *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).

Here, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulation, case law, and Social Security Rulings and was supported by substantial evidence. 20 C.F.R. § 416.929(b) (2009); SSR 96-7p, 1996 WL 374186 (July 2, 1996); *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). The ALJ expressly referenced the evidence which brought into question Claimant's allegations of

disability, and the evidence clearly reflected that the level of severity described by the Claimant did not often correlate well with his level of activity and actions.

###### B.      Combination of Impairments

Claimant argues that the ALJ failed to consider the synergistic effect of Claimant's impairments when determining the extent to which they, in combination, limited his ability to work.  (P. Br. at 13-14).  Although Claimant does not identify the precise listing to which he refers, he contends that the total impact of his impairments met or exceeded the disability criteria of the "combination of impairments listing" provided by the SSA.  To the contrary, the Commissioner asserts that the ALJ thoroughly considered whether Claimant's combined impairments met or medically equaled any of applicable impairments contained in the Listing and reached the logical conclusion that these impairments did not meet or equal any of them. (Def. Br. at 18-19).

Unquestionably, the ALJ was required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989).  The social security regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523.  Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity."

*Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed, *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983), because, as the Fourth Circuit Court of Appeals has stated, "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." *Walker v. Bowen, supra* at 50.

Here, the ALJ fulfilled her obligation to evaluate Claimant's impairments, separately and in combination, specifically addressing how they affected Claimant's functional capacity. At the second step of the sequential evaluation, the ALJ considered each of Claimant's medical conditions separately, identifying their concomitant symptoms and assessing their severity. (Tr. at 14-15). Then, at the third step of the evaluation, the ALJ analyzed the combined effect of the conditions and their resulting limitations on the listings pertinent to the musculoskeletal system, the pulmonary system, and the psychiatric system. (Tr. at 15-16). The ALJ fully explained her reasons for finding that Claimant's impairments did not met or medically equal any of the potentially applicable listings. She emphasized that Claimant did not have objective medical evidence of spinal impairment or neurological deficits; his FEV1 was within the normal range; and his functioning in the four broad categories of functional limitations related to mental disorders was mildly impaired at most. (*Id*). Reviewing the available evidence, the Court finds that the ALJ performed a thorough analysis and her determination has substantial evidentiary support.

### C.      Weight of Medical Source Opinions

Claimant's final assertion of error is that the ALJ improperly disregarded the opinions of Dr. Shelley Bailey, Claimant's treating physician, and Dr. Jose Ricard, a consultant of DHHR. (Pl.'s Br. at 14-15).   In particular, Claimant points to (1) two physician summaries completed by Dr. Bailey that found Claimant's physical capabilities to be significantly limited; and (2) a report by Dr. Ricard stating that Claimant could not work due to his history of CVA. (*Id.).*

20 C.F.R. §§ 404.1527(d) and 416.927(d) outline how medical opinions will be weighed in determining whether a claimant qualifies for disability benefits.  In general, the SSA will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source.  *See* 20 C.F.R. §§ 404.1527(d)(1) and 416.927(d)(1). Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  *See* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence."  *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2008).

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.   20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). If the ALJ finds that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(d)(2)-(6) and 416.927(d)(2)-(6).  These factors include: (1) length of the treatment relationship and

frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors.  "A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator."  SSR 96-2p.  Ultimately, it is the responsibility of the Commissioner, not the court, to evaluate the case, make findings of fact, and resolve conflicts of evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  When a treating source's opinion is not given controlling weight, and the opinions of agency experts are considered, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources. . ." 20 C.F.R. §§ 404.1527 and 404.927.  The regulations assure that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  *Id.* §§ 404.1527(d)(2), 416.927(d)(2).

Medical source opinions on issues reserved to the Commissioner are treated differently than other medical source opinions.  20 C.F.R. §§ 404.927(e) and 416.927(e).  In both the aforestated regulations and Social Security Ruling 96-5p, the SSA addresses how medical source opinions are considered when they encroach upon these "reserved" issues; for example, opinions on "whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (the listings); what an individual's residual functional capacity (RFC) is;. . . . and whether an individual is 'disabled' under the Social Security Act. . ." Opinions concerning issues reserved for the

Commissioner are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled."  SSR 96-5p at 2.  However, these opinions must always be carefully considered and "must never be ignored."  *Id.*

In the present case, the ALJ complied with the requirements of the social security regulations, both by adequately assessing the opinions of all of the physicians and by explaining why she had reservations, in particular, about the opinions of Dr. Bailey and Dr. Ricard.  Addressing Dr. Bailey's opinions on Claimant's functional capacity, the ALJ noted that Dr. Bailey "observed in June 2006 and May 2007 that claimant is unable to stay in the same position for extended lengths of time and unable to carry more than five pounds and would be limited to lifting [no] more than 10 pounds."  The ALJ discounted the accuracy of these limitations, because "[i]t appears that the limitations were based on the claimant's self-reports. . . ."   (Tr. at 20).  The ALJ further noted that Dr. Bailey recognized a need for a "functional capacity evaluation," suggesting that she did not intend for her summary statements to constitute or replace a full assessment of Claimant's RFC. (*Id.*). Consequently, the ALJ turned to the comprehensive physical examination and evaluation performed by Dr. Apgar in August 2008, which provided specific findings and observations of Claimant's functional limitations.   The ALJ explicitly rejected Dr. Bailey's summaries and adopted Dr. Apgar's assessment, because it was detailed, based upon a recent evaluation, and was more consistent with the other evidence of record.  (Tr. 20-21).

In regard to Dr. Ricard, the ALJ disregarded his assessment because it was "based solely on the claimant's allegations and not on clinical testing and only for the purposes of obtaining a medical card from the state." (Tr. at 20). More importantly, the ALJ emphasized that Dr. Ricard had never treated Claimant and had no objective medical evidence that Claimant actually had suffered a CVA. In addition, Dr. Ricard did not elaborate on Claimant's specific limitations or explain how they prevented Claimant from working; therefore, the ALJ determined that Dr. Ricard's opinions were unfounded. (*Id*).

Considering the nature of the opinions and the analysis performed by the ALJ as documented in her decision, the Court finds that the ALJ complied with the applicable regulations in her contemplation of all of the medical source opinions. In making this determination, the Court reemphasizes that an ALJ is only required to afford controlling weight to a treating physician's opinion if it is supported by clinical and laboratory diagnostic techniques, is not inconsistent with other substantial evidence, and is not an opinion on a matter reserved to the Commissioner. In the present case, the ALJ did not reject the opinions of Claimant's treating physician in their entirety and disregarded them only to the extent that they were inconsistent with the remaining evidence of record. Therefore, the Court finds that the ALJ's decision not to afford controlling weight to Claimant's treating physician's opinions, or to the opinions of a DHHR consultant whose purpose was to evaluate Claimant for a medical card, is supported by substantial evidence.

## VIII. <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment

Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  March 17, 2011.

Cheryl A.  Eifert
United States Magistrate Judge